# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **JULIE HUGHES CHRISLEY,** | : | |
| **Individually, and in her capacity as the** | : | |
| **majority owner of CHRISLEY ASSET** | : | |
| **MANAGEMENT, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.** |
| | : | **1:12-cv-03524-CAP** |
| **v.** | : | |
| | : | **JURY TRIAL** |
| | : | **REQUESTED** |
| **MARK BRADDOCK,  KEY ASSET** | : | |
| **SOLUTIONS LLC, ALINA CLERIE,** | : | |
| **ARC AUTO BROKERS, LLC, and** | : | |
| **PRIVATE PEERING POINT, LLC** | : | |
| **d/b/a VOCALCLOUD,** | : | |
| | : | |
| **Defendants.** | : | |

## FIRST AMENDED COMPLAINT

Plaintiff Julie Hughes Chrisley files this her First Amended Complaint, in
response to the Defendants' Motions for More Definite Statement and in
accord with this Court's order of December 13, 2012 as follows:

I.  INTRODUCTION

1.

This is an action brought pursuant to the Racketeer Influenced and
Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*    Plaintiff
alleges that the Defendants formed an informal association which furnished

a vehicle for the commission of federal crimes affecting interstate commerce and that Defendants have participated, directly or indirectly, in the affairs of this enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), from approximately 2009 through and including 2012.

2.

Plaintiff states that she is a person who has been injured in her business and property by reason of the Defendants' violation of 18 U.S.C. §1962 and, therefore, has standing to sue in this court and to recover treble damages and court costs under 18 U.S.C. §1964(c).

II. <u>JURISDICTION</u>

3.

This court has original jurisdiction in this action predicated on 18 U.S.C. §1964(b) and 18 U.S.C. §1331.  The court has pendant jurisdiction of the state law claims pursuant to 28 U.S.C. §1367.

III.   <u>VENUE</u>

4.

Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. §1391 and 18 U.S.C. §1965 insofar as the Defendants reside in, are found in, have an agent in, and/or transact their affairs in the Northern

District of Georgia where a substantial part of the events complained of herein occurred.

IV.    <u>PARTIES</u>

5.

Plaintiff Julie Hughes Chrisley is a resident of the State of Florida and she also maintains a home in Georgia.  Plaintiff submits to the jurisdiction of this Court.  Plaintiff is the majority owner of Chrisley Asset Management, LLC (hereinafter, "CAM"), a Georgia limited liability company, doing business in Atlanta, Georgia and elsewhere.  Plaintiff Chrisley is a person injured in her business and property by reason of Defendants' violation of 18 U.S.C. §1962, and she has a right to sue and recover damages and costs pursuant to 18 U.S.C. §1964(c).

6.

Defendant Mark Braddock is a resident of Georgia.   In 2005, Braddock joined Chrisley Asset Management as a "practice partner" to procure new business for CAM, service existing clients of CAM and service the personal finances of the Chrisley family, including Mrs. Chrisley and her husband, Todd Chrisley (hereinafter, "the Chrisleys").   These duties included handling all of the personal bills for the Chrisleys. Braddock held the title of Vice President of CAM. He was given a 30% interest in CAM, as

described in CAM's Amended Operating Agreement, dated November 4, 2005. He also owns a 100% interest in Key Asset Solutions LLC, described below.

7.

Defendant Key Asset Solutions, LLC (hereinafter, "Key") is a Georgia limited liability company. Defendant Braddock is the sole owner of Key.  Key is a pass-through entity, which was set up for the purpose of receiving wire transfers of Braddock's share of profits distributions from CAM.

8.

Defendant Alina Clerie is a resident of Georgia. She held the title of Vice President of Finance for CAM.  Her duties included keeping the books and records of CAM, as well as paying the bills for the company.  In particular, she was responsible for paying the 571 Reimbursements (described further herein below) to agents who handled the sales of foreclosed properties belonging to Fannie Mae and managed by CAM.

9.

Defendant ARC Auto Brokers LLC (hereinafter, "ARC") is a Georgia limited liability company with its principal place of business located in Fulton County Georgia.  ARC Auto Brokers is engaged in the brokerage sale

of automobiles.  Defendant Alina Clerie is a 50% owner of ARC and her husband, Roland Clerie, owns the other 50% and manages the business.

<div align="center">10.</div>

Defendant Private Peering Point LLC d/b/a VocalCloud (hereinafter, "VocalCloud") is a Georgia limited liability company with its principal place of business located in Atlanta, Georgia.  VocalCloud is an Internet Technology ("IT") company, which, under the direction of Mark Braddock, provided IT services to CAM at all times relevant to the allegations in the complaint.  VocalCloud also provided IT services to the Chrisleys at their home.

## V. SUMMARY OF FEDERAL RICO CLAIM

<div align="center">11.</div>

At all times relevant to the allegations in this Complaint, Defendants were part of an enterprise, as defined in 18 U.S.C. § 1961(4).  As more particularly alleged herein below, Defendants were a group of individuals associated in fact.  The enterprise operated by using the personnel, assets and finances of a legitimate company, CAM, to engage in illegal activities, which affected interstate commerce

12.

Plaintiff further alleges Defendants violated 18 U.S.C. §1962(d) by agreeing to facilitate the operation of the enterprise through a pattern of racketeering activity aimed at illegally draining funds from CAM, including mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. §1343, and bank fraud in violation of 18 U.S.C. §1344.

13.

The pattern of criminal activity engaged in by the Defendants was the proximate cause of injuries to Plaintiff Chrisley's business interests, including the loss of value of her ownership interest in CAM, lost income and profits from CAM, and damage to her business reputation.

VI.   FACTUAL BACKGROUND RELEVANT TO ALL CLAIMS

14.

CAM was organized in 2005 and is registered with the Secretary of State as a Georgia limited liability company.  CAM also maintains, or has maintained at times relevant to the allegations in this Complaint, offices in Los Angeles, California and Destin, Florida.   Additionally, CAM is, or has been, at times relevant to the allegations in this Complaint, registered to do business in many states around the country in connection with the conduct of

its business as a manager of bank-owned foreclosed properties, as more particularly described herein below.

15.

From 2009 through 2012, Plaintiff and her family lived for extended periods in California or Florida, although they have maintained a home in Atlanta at all times relevant to this matter.

16.

CAM is owned sixty percent (60%) by Plaintiff Julie Chrisley, ten percent (10%) by her husband Michael Todd Chrisley, and thirty percent (30%) by Defendant Mark Braddock.

17.

Insofar as the Plaintiff and her husband frequently were not available to participate in the management of the business, Defendant Braddock ran the day-to-day operation of CAM as their "practice partner," receiving 30% of the profits as his compensation.

18.

From 2005 to 2012, CAM's business was as an "Asset Manager," managing foreclosed properties for lenders, including the Federal National Mortgage Association ("Fannie Mae").

19.

Fannie Mae is a Government Sponsored Enterprise ("GSE"), and as such, it is regulated by the U.S. Department of Housing and Urban Development ("HUD").  It was taken over by the federal Government in 2008 and at all times relevant hereto has received federal monies, including without limitation, approximately $116 Billion in federal funds in the form of "bailout" money through the end of 2012.

20.

At all times relevant to this Complaint, CAM's largest volume of business came from Fannie Mae, which principal place of business is in Dallas, Texas; however, Fannie Mae operates across the country, including in Georgia, and more specifically, the Northern District of Georgia.

21.

In doing business with CAM, Fannie Mae, through its office in Dallas, Texas, would assign approximately 400 to 600 foreclosed properties each month to CAM for management.

22.

CAM used real estate agents, located across the country, to secure each of these bank-owned properties (also known as "REO" properties) and

to oversee the necessary maintenance or repair to the houses, and, finally, to list and sell each property.

23.

Fannie Mae's practice and procedure was to use its Asset Management companies, such as CAM, as a conduit to pay the agents a commission on the sale of each property and reimbursement for expenses they incurred in preparing and selling the properties.  These funds were referred to and commonly called "571 Reimbursements."

24.

Fannie Mae also paid CAM a management fee for each property that was sold.  These fees were used to fund the operation expenses and overhead for the company; and the profits were to be distributed pro rata to the owners, including 60% to Plaintiff Julie Chrisley and 30% to Defendant Mark Braddock.

25.

In August 2010, Gina Longo, Chief Operating Officer of CAM since its inception in 2005, reported to Todd Chrisley that Mark Braddock was mishandling CAM's financial accounts.

26.

As a result of this knowledge and to avoid further affiliation with Braddock, Longo tendered her resignation in August of 2010 and a new Chief Operating Officer, Dawn Marie O'Connor, was appointed.

27.

In September 2010, the new COO, Ms. O'Connor, informed Mr. Chrisley that Braddock was misrepresenting the company's status during a meeting with representatives of Fannie Mae.

28.

In that meeting, Braddock stated falsely he would soon be the sole owner of CAM because he intended to "buy the Chrisleys out."

29.

COO O'Connor resigned in late 2010 or early 2011, approximately six months after she was employed, because she did not want her business reputation damaged by an affiliation with Braddock.

30.

Following O'Connor's resignation, the Chrisleys began a thorough investigation of the allegations by Longo and O'Connor.

31.

Since Defendant Braddock controlled not only the day-to-day operations of CAM, but also the Chrisley's personal finances, the investigation established it was possible for Braddock to deceive Plaintiff and her husband and manipulate CAM's funds as long as he had the cooperation of Defendant Clerie, the Vice President of Finance, and of CAM's IT company, Defendant VocalCloud.

VII.   FACTUAL ALLEGATIONS RELATING TO CONSPIRACY BY DEFENDANTS BRADDOCK, CLERIE AND VOCALCLOUD TO DEFRAUD PLAINTIFF AND FANNIE MAE

32.

From 2010 through 2012, Defendant Braddock conspired with Defendant Clerie to defraud Fannie Mae and Plaintiff in order to illegally divert 571 Reimbursement funds wired to CAM's bank by Fannie Mae.

33.

Fannie Mae's agents managed by CAM were required to mail, fax or email CAM any requests for commissions and reimbursement for expenses incurred in selling foreclosed properties managed by CAM.  Under the direction of Defendant Clerie, CAM would then email the requests to Fannie Mae, including the amounts that had allegedly been paid to the agents.

34.

On receipt of the evidence for representing that CAM had paid its agents, Fannie Mae would wire the funds to CAM's bank as reimbursement for its payment to the agents.

35.

At Braddock's direction, Clerie entered Fannie Mae 571 reimbursement checks as "paid" in the accounting system, printed the checks to the agents, but held the checks, never actually mailing them to the agents who were entitled to receive them.

36.

The amount of reimbursement money sent by Fannie Mae to CAM varied over time, but ranged between $200,000 to $700,000 per month.

37.

Since the 571 Reimbursement payments to agents had been "booked" but had not actually been made, Defendant Braddock was able to "skim" the "excess" money and convert the funds for his personal use and pay his co-conspirators.

38.

By late 2011, CAM was receiving an increasing volume of complaints from agents because of non-payment of the 571 Reimbursement requests.

39.

In February 2012, Fannie Mae required CAM to submit a response to an RFP in order to continue to receive business from Fannie Mae.   On March 22, 2012, Fannie Mae conducted an audit in the offices of CAM.

40.

On or about March 22, 2012, in the course of its audit of CAM, Fannie Mae requested to see a random sample of cancelled checks showing payments of 571 Reimbursements to agents by CAM.

41.

At the direction of Defendant Braddock and/or Defendant Clerie, Steve Lindsey, an employee of Defendant VocalCloud, electronically altered the checks that were requested by Fannie Mae to show they had been cancelled by the bank, when, in fact, they had been held by CAM and never sent to the agents.

42.

Defendants Clerie and Braddock then presented these checks to the auditors as evidence the checks to the agents had been paid, when, in fact, they had not.

43.

The alteration of the checks was conducted as part of the pattern of criminal acts conducted by Defendants Braddock, Clerie and VocalCloud with intent to defraud Fannie Mae as well as Plaintiff Chrisley for the purpose of illegally diverting money from CAM.

44.

Based on information presently available to Plaintiff, from July 2010, to November 2011, CAM's QuickBooks entries show that it paid checks to agents for 571 Reimbursements from Fannie Mae in batches.  However, a large number of checks matching check numbers booked as paid in CAM's accounting system for reimbursements during this period were found in a box.  The checks, which were never mailed to the agents, totaled $266,000

45.

Based on information currently available to Plaintiff, the amount of money that was entered as "paid" but was not actually sent to agents working for CAM around the country between 2009 and 2012 was, at a minimum, $800,000, based on a preliminary review of boxes of envelopes from CAM's offices containing unpaid checks made payable to agents for 571 Reimbursements.

46.

Plaintiff expects that discovery in this case will reveal additional money diverted from CAM's accounts by Defendants Braddock and Clerie..

47.

On June 6, 2012, Fannie Mae informed CAM it had not been selected. CAM had no other clients except Fannie Mae at this time.

48.

CAM is presently in receivership and is preparing to file for bankruptcy.

VIII. <u>FACTUAL ALLEGATIONS RELATED TO CONSPIRACY BY DEFENDANTS BRADDOCK AND CLERIE TO DEFRAUD PLAINTIFF AND CHASE BANK</u>

49.

On June 8, 2012, two days after CAM lost the Fannie Mae account, Defendant Braddock, made four separate cash withdrawals of $9500.00 each from CAM's account at Chase bank.

50.

In order to withdraw the money in cash, Defendant Braddock had to make separate withdrawals at different branch banks, each withdrawal was for $9500.00, just under the $10,000.00 limit which, under federal banking law, would trigger the bank's duty to file a Currency Transaction Report.

51.

On June 11, 2012, Defendant Braddock and/or Defendant Clerie made two electronic transfers, each in the amount of $9500.00, from CAM's account at Chase.

52.

None of these transactions was made as part of the legitimate business of CAM and, in fact, were made under false pretenses by Braddock, aided and assisted by Clerie, for the purpose of diverting these funds from CAM for Defendant Braddock's personal use.

53.

The withdrawals and transfers by Defendants Braddock and Clerie were part of a scheme to defraud Chase Bank and Plaintiff in order to obtain money from CAM that did not belong to them and to which they were not entitled.

54.

Plaintiff individually and as the majority owner of CAM was injured by the conduct of Defendants Braddock and Clerie in that their fraudulent withdrawal of money belonging to CAM damaged the business and was also a direct theft from Plaintiff, who was entitled to profits from the company.

IX.   FACTUAL ALLEGATIONS RELATED TO  ARC AUTO
BROKERS LLC AND KEY ASSET SOLUTIONS LLC

55.

Defendant ARC Auto Brokers LLC received funds from CAM
intended as a reward to Defendant Clerie for her participation in the
conspiracy to defraud Fannie Mae, Chase Bank and the Plaintiff.  Defendant
Clerie wired the funds from CAM's bank account to Defendant ARC Auto
Brokers LLC at the direction of Defendant Braddock.

56.

Defendant Braddock used Defendant Key Asset Solutions LLC as a
conduit to divert money from CAM's bank account for his personal use.
Funds from CAM were illegally wired to Key's account by Defendant Clerie
at the direction of Defendant Braddock.

57.

Between 2009 and 2012, Defendant Braddock paid Defendant Clerie
approximately $95,000.00 in excess of her salary out of CAM's funds as a
"reward" for her collaboration in the conspiracy to steal money from CAM,
and at least $26,000.00 of this money was paid to her through wire transfer
from CAM to her company, ARC Auto Brokers.

58.

Between 2009 and 2012, Defendant Braddock received approximately $1.4 Million in excess and unauthorized draws and payments from CAM, with the majority of this sum transferred by wire from CAM to Key Asset Solutions LLC.

X. COUNT I:  VIOLATION OF 18 U.S.C. §1962(c)
   AGAINST ALL DEFENDANTS

59.

Plaintiff references and incorporates herein the Factual Allegations Relevant to All Claims, Paragraphs 14-31; Factual Allegations Relating to ARC Auto Brokers and Key Asset Solutions LLC, Paragraphs 55-58; the Factual Allegations of Conspiracy to Defraud Plaintiff and Fannie Mae, Paragraphs 32-48; and Factual Allegations of Conspiracy to Defraud Plaintiff and Chase Bank, Paragraphs 49-54.

60.

The Defendants participated in an enterprise comprised of their ongoing association in fact during which they functioned as a unit for the purpose of conducting illegal activities.

61.

These Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity

and for the unlawful purpose of intentionally defrauding the Plaintiff and others, including Fannie Mae.

<div align="center">62.</div>

Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts, including mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and bank fraud in violation of 18 U.S.C. 1344, as detailed in the counts herein below.

<div align="center">63.</div>

The Defendants have directly and indirectly conducted and participated in the conduct of the enterprises affairs through the pattern of racketeering activity, as defined in 18 U.S.C. §1961(5), in violation of 18 US.C. §1962(c).

<div align="center">64.</div>

As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. §1962(c), Plaintiff has been injured in her business and property, in that:  The monetary value of her 60% ownership interest in CAM has been destroyed; she has lost significant profits and income; and her business reputation has been damaged.

XI.   COUNT II:  VIOLATION OF 18 U.S.C. §1962(d)
      AGAINST ALL DEFENDANTS

65.

Plaintiff references and incorporates herein the foregoing Paragraphs 59 – 64.

66.

As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. §1962(d), specifically to conduct and participate in the affairs of an enterprise through a pattern of racketeering activity.

67.

The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C, §1962(c), in violation of 18 U.S.C. §1962(d).

68.

As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d),  Plaintiff , personally and in her capacity as the majority owner of CAM, has been injured in her business and property insofar as the value of Plaintiff's ownership  interest in the ongoing business of CAM has been destroyed.  Further, Plaintiff was cheated of profits to which she was entitled, which were embezzled by the Defendants' through their scheme to drain money out of CAM while it was in operation.  Finally, Plaintiff has suffered injury to her business reputation and lost business opportunity because of Defendants' deception of Fannie Mae. All of these injuries are a direct and proximate result of Defendants' conspiracy to defraud Plaintiff and Fannie Mae and to embezzle funds from the company.

XII.   COUNT III:  FIRST PREDICATE ACT:
       MAIL FRAUD BY DEFENDANTS BRADDOCK
       AND CLERIE IN VIOLATION OF 18.U.S.C. §1341

69.

Plaintiff references and incorporates herein the Factual Allegations Relevant to All Claims in Paragraphs 14 through 31.

70.

In November 2011, in an attempt to obtain new business, CAM sent a response to a Request for Proposal (hereinafter "RFP") from the Federal Home Loan Mortgage Company ("Freddie Mac") by Federal Express and/or U.S. Mail.

71.

Like Fannie Mae, Freddie Mac is a public, government-sponsored enterprise ("GSE").  Its primary place of business is in Fairfax County, Virginia, however, it operates throughout the United States, including Georgia and, more specifically, the Northern District of Georgia.  In 2008, the United States Treasury purchased $1Billion of Freddie Mac stock.

72.

The information prepared by Defendants Braddock and Clerie in the response to the aforesaid RFP contained false representations, including fraudulent financial statements.

73.

Although Freddie Mac at first indicated that CAM had won the contract, it withdrew its acceptance on discovering the misrepresentations in CAM's bid package.

74.

As a majority owner of CAM, entitled to 60% of its profits, Plaintiff was injured as a direct result of fraud by Defendants Clerie and Braddock that resulted in the loss of a valuable contract for CAM.

75.

Insofar as Plaintiff reasonably relied on false and fraudulent representations by Braddock and Clerie regarding the status of the company, she did not investigate or have cause to investigate CAM's financials until 2011. By then, CAM had been essentially bankrupted by Defendants' conspiracy to defraud CAM's client Fannie Mae and its potential new client, Freddie Mac.

XIII. COUNT IV:   WIRE FRAUD BY DEFENDANTS BRADDOCK, CLERIE, KEY ASSET SOLUTIONS, LLC AND ARC AUTO BROKERS LLC IN VIOLATION OF 18 U.S.C. §1343

76.

Plaintiff references and incorporates herein the Factual Allegations Relevant to All Claims in Paragraphs 14 through 31 above, Factual Allegations Relating to ARC Auto Brokers LLC and Key Asset Solutions LLC, Paragraphs 55-58 and the Factual Allegations of Conspiracy to Defraud Plaintiff and Fannie Mae, Paragraphs 32-48.

77.

Communications between CAM and Fannie Mae were conducted primarily by email and electronic transmission of documents, including email and internet communications, being instrumentalities of interstate commerce.

78.

Defendant Clerie, in conspiracy with and at the direction of Defendant Braddock, received requests for commissions and reimbursement from agents across the country by email, including electronic attachment of documents substantiating their expenses.

79.

Defendant Clerie, again in conspiracy with and at the direction of Defendant Braddock, would periodically electronically transmit a request for 571 Reimbursement funds to Fannie Mae.

80.

In reliance that CAM had paid the agents, as required by Fannie Mae's practice and procedure, Fannie Mae would transmit the funds by wire transfer to CAM.

81.

Defendant Clerie entered payments in the Company's QuickBooks accounting system, but, as part of her scheme with Defendant Braddock, the checks were held and not paid out to the agents.

82.

Defendants wired the "excess funds" created by the non-payment of the agents to Defendant Clerie's company, ARC Auto Broker LLC, and to Braddock's company, Key Asset Solutions LLC, thereby converting the money for their personal use.

83.

To cover their deception of Fannie Mae, Defendants Braddock and Clerie made repeated false statements on the telephone to Plaintiff and her husband and prepared fraudulent financial statements, audit reports and other documents, which they sent electronically and via email attachments to Fannie Mae.

84.

Defendants intended to defraud the Plaintiff and did defraud her by sending fraudulent financial information about CAM that kept her from learning the truth about their theft of 571 Reimbursement funds.

85.

Defendants' actions constitute wire fraud in violation of 18 U.S.C. §1343.

86.

Plaintiff, as the majority owner of CAM, was injured as a direct result of the Defendants' wire fraud in that their theft of money from CAM and fraud against the company's only client resulted in the loss of Fannie Mae's account and the eventual bankruptcy of the business.

XIV.  COUNT V:  BANK FRAUD IN VIOLATION OF 18 U.S.C. §1344
       AGAINST DEFENDANTS BRADDOCK AND CLERIE

87.

Plaintiff references and incorporates herein the Factual Allegations Relevant to All Claims in Paragraphs 14 through 31 above, Factual Allegations Relating to Conspiracy to Defraud Plaintiff and Chase Bank, Paragraphs 49-54.

88.

On June 8, 2012, Defendant Braddock, representing himself as an officer of CAM making authorized transactions on behalf of CAM, made four withdrawals of $9500.00 each from CAM's account at separate branches of Chase Bank and, subsequently used the money for his personal use.

26

89.

On June 11, 2012, Defendant Braddock, representing himself as an officer of CAM making authorized transactions within the scope of his duties at CAM, ordered two wire transfers of $9500.00 each out of CAM's account to an account which, on information and belief, was a personal account of Defendant Braddock's.

90.

Defendant Clerie conspired with and assisted Defendant Braddock in deceiving Chase Bank and the Plaintiff, in that she kept the books and records of CAM and was aware that these transactions were neither authorized nor legitimate expenses of CAM and that these withdrawals were made with the intent to take money from CAM.

91.

Defendants Braddock and Clerie conspired to commit bank fraud in violation of 18 U.S.C. §1344, insofar as they knowingly executed a scheme to defraud Chase Bank, a federally-insured financial institution, to obtain money in the custody and control of the bank using false or fraudulent pretenses, were in such amounts and different branches in an effort to thwart the responsibility of the bank to file required Currency Transaction Reports. *See,* 31 U.S.C. §5311; 31 C.F.R. §103.

92.

Plaintiff was directly and proximately injured by the Defendants' fraud because she is the majority owner of CAM and she therefore possessed a business interest in the company, including the damages to the company as a result of the theft of funds.

XV.   VIOLATION OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (" GEORGIA RICO"), O.C.G.A. 16-4-3 AGAINST ALL DEFENDANTS

A.   SUMMARY OF FACTS RELATING TO GEORGIA RICO CLAIMS

93.

Plaintiff references and incorporates herein the Factual Allegations Relevant to All Claims, Paragraphs 14-31.  In addition, Plaintiff references and incorporates herein the Factual Allegations Relating to Conspiracy to Defraud Plaintiff and Fannie Mae, Paragraphs 32-48 and the Factual Allegations Related to Conspiracy to Defraud Plaintiff and Chase Bank, Paragraphs 49-54 herein above.

94.

On or about January 2009 through June 2011, Defendant Braddock and Defendant Clerie conspired to take money from CAM without the

knowledge of Plaintiff by taking more than Defendant Braddock's 30% share of profits distributions from CAM.

95.

For example, in the second quarter of 2009, records show that CAM produced profits of $6,098,660.98 for its partners.  Defendant Braddock's 30% share of these profits should have been $1,829,598.29; however, the records show that Braddock took $2,677,073.98 of the profits for this period.

96.

Braddock also failed to pay the Plaintiff and her husband their share of the profits for some quarterly periods.

97.

For example, in the fourth quarter of 2010, CAM produced profits of $1,585,787.79.   The Chrisleys should have received a total of 70% of the profits, or $1,110,051.45; however, they only received $500,262.64.

98.

From January 2009 through June 2011, CAM produced profits of $12,215,854.11.  Defendant Braddock's 30% share of these profits should have been $3,664,756.23; however, records show he paid himself $5,123,852.48.

99.

To disguise this scheme, Defendants Braddock and Clerie provided false information and made false statements regarding CAM's profits to Plaintiff and her husband.

100.

Defendant Clerie, as the Vice President of Finance for CAM and the only employee keeping CAMS books conspired with Defendant Braddock to cover up the theft of money from CAM.

B.   COUNT I:   GEORGIA RICO – FIRST PREDICATE ACT:
     THEFT BY DECEPTION IN VIOLATION OF O.C.G.A.
     §16-8-3(b)(1) – (3) AGAINST BRADDOCK AND CLERIE

101.

Defendants Braddock and Clerie conspired to obtain money from CAM by means of deceit with the intention of depriving CAM and Plaintiff, its majority owner, of these funds.

102.

Defendants conspired to take 571 Reimbursement funds, as previously alleged in the foregoing Facts Relating to Conspiracy to Defraud Fannie Mae and Plaintiff, Paragraphs 32-48.

103.

In addition, the Defendants deceived the Plaintiff by creating a false impression of CAM's financial status and the amount of profits to be distributed which Defendants knew to be false.

104.

Defendants also failed to correct the false impression they had previously created, in order to further deceive the Plaintiff.

105.

Defendants also created false documents and made false statements in order to prevent the Plaintiff from acquiring information that would have permitted her to discover that the Defendants were working together to steal 571 Reimbursement funds from Fannie Mae and that they also were stealing CAM's profits.

106.

Plaintiff was legally entitled to rely on information, reports and statements by Defendant Braddock pursuant to O.C.G.A. §14-11-305(2)(A).

107.

The foregoing acts of theft by deception against the Plaintiff constitute "racketeering activity" as defined in O.C.G.A. §16-14-3(9)(B) and are violations of O.C.G.A. §16-8-3(b)(1)–(3).

C.   COUNT II:  GEORGIA RICO – SECOND PREDICATE ACT:
     THEFT BY CONVERSION IN VIOLATION OF
     O.C.G.A. §16-8-4(a) AGAINST BRADDOCK AND CLERIE

108.

Plaintiff references and incorporates the Summary of Facts relating to

all RICO Claims, Paragraphs 14 - 31.

109.

When CAM produced profits, the Defendants were required by the

company's Operating Agreement to distribute the profits by the specified

percentage owed to each owner.

110.

Defendant Braddock, with the collusion of Defendant Clerie,

knowingly converted more than his share of profits from CAM to his own

use in violation of his legal obligation to the Plaintiff.

111.

The foregoing acts of theft by conversion constitute "racketeering

activity" as defined in O.C.G.A. §16-14-3(9)(B) and in violation of

O.C.G.A. §16-8-4(a).

D.   COUNT III:  GEORGIA RICO – THIRD PREDICATE
     ACT:  VIOLATION OF THE GEORGIA COMPUTER
     SYSTEMS PROTECTION ACT, O.C.G.A. §16-9-3(d)
     AGAINST VOCALCLOUD, CLERIE AND BRADDOCK

112.

Plaintiff references and incorporates herein the allegations in the Facts Relating to the Conspiracy to Defraud Fannie Mae, Paragraphs 32-48.

113.

Defendant VocalCloud, through its agent Steve Lindsey, used CAM's computer system, at the direction of Defendants Braddock and/or Clerie to create electronically altered checks; specifically, VocalCloud's agent took checks which had not been cashed and applied a computer-generated cancellation mark on the back of each check.

114.

These electronically altered checks were then presented with the intent to deceive auditors from Fannie Mae by causing them to believe the checks had been cashed by agents and CAM had paid the 571 Reimbursements that were due, when, in fact, the checks had never been mailed.

115.

Defendant's acts of computer forgery constitute "racketeering activity" as defined by O.C.G.A. §16-14-3(9)(xxviii) in violation of the Georgia Computer Systems Protection Act, O.C.G.A. §16-9-93(d).

E.     COUNT IV: GEORGIA RICO:
       FORGERY IN VIOLATION OF O.C.G.A § 16-9-1(d)(2)
       AGAINST DEFENDANTS CLERIE, BRADDOCK AND
       VOCALCLOUD

116.

Plaintiff references and incorporates the foregoing Paragraphs 112 - 115 as if fully restated herein.

117.

Defendants with intent to defraud Plaintiff and Fannie Mae conspired to alter ten or more checks in such a manner that the checks as altered showed they had been cancelled by the bank.

118.

In fact, the checks that Defendant VocalCloud altered, at the direction of Defendants Braddock and Clerie, had never been received by CAM's agents nor had they ever been presented to a bank.

119.

This intentional and fraudulent alteration of the cancellation date purports a "different provision" of the checks in violation of O.C.G.A. §16-9-1(d)(2) and also constitutes "racketeering activity" as defined in O.C.G.A. §16-14-3(A)(viii).

## XVI. BREACH OF FIDUCIARY DUTY  BY DEFENDANT BRADDOCK

### 120.

When CAM lost the Fannie Mae account, in early June 2012, Defendant Braddock breached his fiduciary duty to the Company by organizing a new company, US Asset Management Partners LLC to compete with CAM.

### 121.

Defendant Braddock solicited CAM's employees to work for his new company.

### 122.

At Defendant Braddock's direction, VocalCloud employees removed computer and telephone equipment from CAM and installed it in the basement of Braddock's house as a temporary office for his new company.

### 123.

In late June or early July 2012, Defendant Braddock used CAM's conference room to meet with Rebuild US, a hedge fund that owned foreclosed properties.

124.

Instead of soliciting this company as a client for CAM, Defendant Braddock offered his own company as an asset manager for Rebuild US which violated his specific obligation to find new business for CAM.

125.

At the time Defendant was soliciting clients for his own business, CAM was in the process of losing its largest client, Fannie Mae, and desperately needed new business.

126.

By setting up a competing business, Defendant breached his duty of loyalty as a member of CAM insofar as he did not act in good faith to promote the best interests of the Company as required by O.C.G.A. §14-11-305.

127.

In addition, Defendant Braddock was in a confidential relationship with Plaintiff, as defined by O.C.G.A. §23-1-58, and by creating a competing business while still a member of CAM, he breached the fiduciary duty he owed to Plaintiff, thereby directly and proximately causing damages to Plaintiff individually and in her capacity as the majority owner of CAM.

128.

This breach of Defendant Braddock's fiduciary duty and his duty of loyalty to CAM ultimately led to bankruptcy for the company and, therefore, economic damage to Plaintiff, including the destruction of value of her ownership interest in CAM, significant lost profits and damage to her business reputation.

WHEREFORE Plaintiff prays for relief as follows:

(1) for money judgment for Plaintiff's damages, in an amount to be determined by the jury at the trial of this matter;

(2) for treble damages as a result of Defendants' violations of the Federal and the Georgia RICO Acts;

(3) for costs and attorneys fees; and

(4) such other relief as this court deems equitable, just and proper.

Respectfully submitted this 4th day of February, 2013.

/s/ Bob Barr
Bob Barr
Attorney for Plaintiff Julie Chrisley
Georgia Bar Number 039475
Law Offices of Bob Barr
3101 Towercreek Parkway, Suite 150
Atlanta, Georgia 30339
Tel: 770-836-1776
jennifer@bobbarr.org

/s/ Lee Pruitt
Lee Pruitt
Attorney for Plaintiff Julie Chrisley
Georgia Bar Number 240337
Law Offices of Bob Barr
3101 Towercreek Parkway, Suite 150
Atlanta, Georgia 30339
Tel: 770-836-1776
lee@bobbarr.org


/s/ Valle S. Ashley
Valle S. Ashley
Attorney for Plaintiff Julie Chrisley
Georgia Bar Number 235960
Law Offices of Bob Barr-Of Counsel
3101 Towercreek Parkway, Suite 150
Atlanta, Georgia 30339
Tel: 770-836-1776
valle@bobbarr.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2013, I electronically filed this Response with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Todd Stanton, Counsel for Mark Braddock, Leslie Braddock, Key Asset Solutions, LLC, and Watercolor Retreat, LLC;

Warren Lietz, Counsel for Mark Braddock;

Kevin Maxim, Counsel for Alina Clerie and ARC Auto Brokers, LLC; and

Michael F. Hanson, Counsel for; Grace Realty Group, LLC and Valencia Walker;

<div style="margin-left: 50%;">
/s/ Lee Pruitt          <br>
Lee Pruitt<br>
Attorney for Plaintiff Julie Chrisley<br>
Georgia Bar Number 240337<br>
3101 Towercreek Parkway, Suite 150<br>
Atlanta, Georgia 30339<br>
Tel: 770-836-1776<br>
lee@bobbarr.org
</div>

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

Respectfully submitted,

This 4th day of February 2013.

/s/ Lee Pruitt
Lee Pruitt
Attorney for Plaintiff Julie Chrisley
Georgia Bar Number 240337
3101 Towercreek Parkway, Suite 150
Atlanta, Georgia 30339
Tel: 770-836-1776
lee@bobbarr.org